1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JAMAL D. HENDRIX, | Case No. 2:15-cv-00560-MMD-NJK |
| Plaintiff, | ORDER |
| v. | |
| STATE OF NEVADA, et al., | |
| Defendants. | |

9
10
11
12
13
14

**I.    SUMMARY**

This case concerns a prisoner's First, Eighth, and Fourteenth Amendment claims brought pursuant to 42 U.S.C. § 1983. Pending before the Court is Defendants' Motion for Summary Judgment ("Motion") (ECF No. 72). Also pending before the Court is Defendants' Motion for Leave to File Confidential Documents under Seal in Support of Defendants' Motion ("Motion to Seal") (ECF No. 74). Plaintiff failed to file a response to either the Motion or the Motion to Seal.

After reviewing the Motion and the accompanying exhibits, the Court grants in part and denies in part Defendants' Motion in the manner discussed below. The Court also grants Defendants' Motion to Seal.

**II.    BACKGROUND**

Plaintiff Jamal Hendrix ("Plaintiff" or "Hendrix"), who is proceeding pro se, is an inmate in the custody of the Nevada Department of Corrections ("NDOC"). (ECF No. 72 at 2.) Plaintiff brings claims against various NDOC employees alleging claims of retaliation, excessive force, deliberate indifference to serious medical needs, and

procedural as well as property due process violations that occurred while Plaintiff was housed at High Desert State Prison ("HDSP"). The claims arise from events that occurred on three separate dates: November 15, November 16, and November 18, 2013.

In Count I, Plaintiff asserts claims relating to a cell move and use of force incident on November 15, 2013. According to Plaintiff, he was escorted by Defendant Gibson to a classification hearing around 10:30 am that day. (ECF No. 9 at 10, 21.) During this hearing, Defendant Filson ordered that Plaintiff be returned to his cell. (*Id.* at 10-11, 21.) Sometime after Plaintiff was returned to his cell, Filson stopped by Plaintiff's cell and told him that as long as he had a bad attitude, he would not let Plaintiff out of administrative segregation. (*Id.* at 11, 22.) Filson also stated that if Plaintiff dropped his lawsuit against certain NDOC staff and stopped writing grievances then Filson would consider giving Plaintiff another classification hearing. (*Id.* at 11-12, 22.) Around this time, Defendants Michael Anderson[1] and Dunn also supposedly showed Plaintiff the inmate grievance he had filed against them for racial discrimination, and Anderson told Plaintiff that the grievance would be the last he wrote. (*Id.* at 11-12, 22-23.) Plaintiff also claims that Defendants Filson, Williams, Leavitt and Neven denied Plaintiff's grievances relating to his complaint against Michael Anderson and Dunn regarding retaliation. (ECF No. 9-1 at 12.)

Later that day, Defendant Gibson informed Plaintiff he was being moved. (ECF No. 9 at 12.) Defendants Joseph, Scott and Nelson placed restraints on Plaintiff's hands and legs and began to remove Plaintiff's personal property from his cell. (*Id.*) Nelson took Plaintiff to disciplinary segregation, but on the way Plaintiff saw Joseph and Scott take Plaintiff's legal boxes to the property room and place legal documents in a trash can. (*Id.* at 12-13.) Plaintiff claims that Michael Anderson and Dunn authorized the confiscation of these legal documents. (*Id.* at 13.) Plaintiff asked Nelson to take him to the property sergeant, where Nelson permitted Plaintiff to speak to the property room sergeant**.** (*Id.* at

---

[1]There are two defendants with the last name Anderson in this case; therefore, the Court adds their first names to differentiate them.

13.) Dawson then appeared at the property room, grabbed Plaintiff's arm, and ordered Nelson to take Plaintiff to disciplinary housing. (*Id.* at 14.) Nelson and Dawson then began "aggressively" walking Plaintiff to disciplinary segregation. (*Id.*) Dawson allegedly grabbed Plaintiff's head and pushed it down while forcing Plaintiff to walk. (*Id.*) Dawson then supposedly began hitting Plaintiff in the face, and Plaintiff fell down. (*Id.* at 14-15.) Nelson then yanked Plaintiff up, bent Plaintiff's arm up in the air, and kneed Plaintiff in the face. (*Id.* at 15.) Dawson then supposedly kneed Plaintiff in the chest and punched Plaintiff again. (*Id.*) Dawson then rolled Plaintiff onto his stomach and placed his knee on the lower part of Plaintiff's back. (*Id.*) Plaintiff states that he was screaming to see medical. (*Id.*)

Plaintiff states that Defendant Jones came over and placed his knee on Plaintiff's neck while simultaneously punching him in the face, Defendant Paul Anderson kneed Plaintiff twice on the left side of the rib cage, and Defendant Trailer placed his foot on Plaintiff's face. (*Id.*) Supposedly Dawson and Jones told Plaintiff that if he stopped writing grievances and let go of the lawsuit then things would start getting better for Plaintiff. (*Id.* at 16.) Michael Anderson and Dunn arrived on scene and supposedly stated that they had "got" Plaintiff and that Plaintiff's books now belonged to them. (*Id.*) Dawson, Jones, Trailer and Paul Anderson then yanked Plaintiff up from the ground, took him to a building, and forced him to strip search while he was in extreme pain. (*Id.*) Plaintiff states that he asked Dawson if he could go to the infirmary, but Dawson told Plaintiff to "shut up and stop asking because he wasn't going to go." (*Id.* at 17.) Plaintiff also states that Scott told Dawson to put the handcuffs tightly on Plaintiff's writing hand, that Trailer, Jones, and Paul Anderson put the leg shackles on too tightly, and that Jones refused to let Plaintiff see medical, stating, "Medical already saw you." (*Id.*)

On the way to the disciplinary unit, Defendant Stroud purportedly ignored Plaintiff's pleas for help while watching as Jones and Trailer dragged Plaintiff into his cell. (*Id.* at 17-18.) Plaintiff states that he became dizzy after Jones squeezed Plaintiff's neck and Trailer squeezed Plaintiff's upper arm. (*Id.* at 17.) At the cell door, Jones supposedly

kneed Plaintiff in the back of the leg, causing Plaintiff to fall and hit his chin on the cell floor. (*Id.*at 18.)

In Count II, Plaintiffs asserts claims relating to a preliminary disciplinary hearing. Around 5:00 pm on November 16, 2013, Defendant Davis escorted Plaintiff to Defendant Emling's office where Plaintiff received notice of disciplinary charges for assault on staff. (*Id.*) Emling called Plaintiff's witness, Defendant Nelson. (*Id.*) Plaintiff requested that the telephone conversation with Nelson be placed on speaker phone or that he be able to listen to Nelson's response. (*Id.* at 18-19.) Emling declined and allegedly choked Plaintiff before sending Plaintiff back to solitary confinement. (*Id.* at 19.) Plaintiff states that Defendants Daniels, Nash, Neven and Williams denied Plaintiff's grievances relating to the incident. (ECF No. 9-1 at 14.)

In Count III, Plaintiff states claims relating to a disciplinary hearing. Around 3:00 pm on November 18, 2013, a disciplinary hearing on assault was conducted. (ECF No. 9 at 19.) Allegedly Defendant Potter told Plaintiff he had already been found guilty of the charges and Plaintiff would be sent to Ely State Prison. (*Id.*) In response, Plaintiff told Potter he had a witness. (*Id.*) Potter then supposedly told Plaintiff no witness would be called, stating that one of the officers had been suspended as a result of Plaintiff's testimony to the Inspector General regarding an excessive force incident. (*Id.*) Plaintiff was found guilty of assault. (*Id.* at 20.) Plaintiff also claims that Defendants Neven, Foster, Daniels and Filson denied his inmate grievances regarding this incident. (ECF No. 9-1 at 17.)

**III.    MOTION TO SEAL (ECF No. 74)**

Defendants request that certain exhibits be sealed—exhibits A, D, E, F, G, H, and J (ECF Nos. 75-1, 75-2, 75-3, 75-4, 75-5, 75-6, 75-7)—because they include Plaintiff's confidential medical records, case notes, and a video recording of a strip search of Plaintiff. (ECF No. 74 at 3.) To establish that the documents are sealable, the parties "must overcome a strong presumption of access by showing that 'compelling reasons supported by specific factual findings ... outweigh the general history of access and the

public policies favoring disclosure.'" *Pintos v. Pac. Creditors Ass'n,* 605 F.3d 665, 679 (9th Cir.2010) (citation omitted).

Defendants argue that pursuant to NRS § 629.061, Administrative Regulation 639, and the Health Information Protection and Portability Act, Exhibits D, E, F, G, and H should be sealed because they consist of Plaintiff's medical records. (ECF No. 74 at 3.) Because Plaintiff has not waived his confidentiality and to prevent Plaintiff's personal possession of the documents in his cell, Defendants contend that these exhibits should be filed under seal. (*Id.*) Defendant argues that because Exhibit A includes confidential and sensitive details about Plaintiff as well as other inmates whom Plaintiff has associated with, it should remain sealed to prevent Plaintiff's personal possession of the document in his cell and to protect Plaintiff's confidentiality. (*Id.*) Defendant also argues that Exhibit J should remain under seal to protect Plaintiff's privacy because it includes obscene language and footage of Plaintiff's strip search on November 15, 2013. (*Id.*) The Court agrees and finds that all of the exhibits should remain under seal as they contain confidential information about Plaintiff, including Plaintiff's medical records as well as medical kites and a video in which Plaintiff appeared naked.

Therefore, Defendants' Motion to Seal is granted.

**IV.    MOTION**

**A.    Legal Standard**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

Hendrix did not respond to the Motion despite the multiple extensions of time granted. Nevertheless, the Court must consider the allegations in Hendrix's verified complaint as evidence in evaluating his opposition to Defendants' Motion. *Jones v. Blanas,* 393 F.3d 918, 923 (9th Cir. 2004) (finding that courts must consider a pro se

6

party's contentions offered in motions and pleadings as evidence in his opposition to the motion for summary judgment "where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [he] attested under penalty of perjury that the contents of the motions or pleadings are true and correct.").

### B. Count I[2]

In Count I, Hendrix brings claims for retaliation, excessive force, deliberate indifference to serious medical needs, and property due process violations against several Defendants. (ECF No. 9 at 10-19, 21-23; ECF No 9-1 at 1-12; ECF No. 8 at 7-10.) The Court grants in part and denies in part summary judgment as to the claims in Count I.

#### i. First Amendment Retaliation Claim

Hendrix alleges that on November 15, 2013, Defendants Michael Anderson and Dunn[3] ordered Defendants Joseph, Scott, and Nelson to confiscate his legal materials because Hendrix had filed a racial discrimination grievance against Michael Anderson. (ECF No. 9 at 22-23; ECF No. 9-1 at 1-3.) He also alleges that Defendants Gibson, Leavitt, Kuloloia, and Filson retaliated against him for filing grievances and lawsuits against NDOC staff by refusing to allow Hendrix to proceed with his classification hearing (ECF No. 9 at 21-22) and that Defendants Williams, Filson, Neven, and Daniels retaliated against him for filing grievances by denying his particular grievances about the prior two incidents (ECF No. 9-1 at 12.)

A viable First Amendment retaliation claim in the prison context requires a plaintiff to allege "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

///

---

[2]In the section discussing Count I, the Court addresses each claim by type, while in the sections discussing Counts II and III the Court addresses the claims by defendant.

[3]Dunn did not join this Motion; therefore, the merits of this claim are analyzed only as they pertain to Defendant Michael Anderson.

advance a legitimate correctional goal." *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (internal footnote omitted).

Defendant Michael Anderson contends that as a law librarian he did not have the authority to order or authorize Defendants Joseph and Scott, who are correctional sergeants, or Defendant Nelson, who is a correctional officer, to search, confiscate, or destroy Hendrix's legal materials. (ECF No. 72 at 10-11; ECF No. 72-23 at 3.) As a result, Michael Anderson contends that he did not take any adverse action against Hendrix as is required for a claim of retaliation. As to the claim against Michael Anderson, Plaintiff merely alleges that his legal boxes were "authorized to be confiscated by . . . Anderson" and that prior to this confiscation Michael Anderson stated to Hendrix that he "might as well give all [his] legal material away." (ECF No. 9 at 12-13.) Hendrix also alleges that while Hendrix was detained that same day, Michael Anderson stated, "I told you I would get you, now your books belong to us." (ECF No. 9 at 16.) None of these allegations address whether Michael Anderson had the authority to order correctional sergeants or officers to confiscate Hendrix's legal boxes. Moreover, in Defendants Joseph, Scott, and Nelson's declarations, they state that they confiscated excessive legal materials when moving Hendrix to a segregation unit because he was allowed only ten checked-out law materials—such as case laws and references—at a time, and any excess law materials were considered to be property of the prison or state. (ECF No. 72-17 at 3; ECF No. 72-24 at 3-4; ECF No. 72-25 at 3-4.) Defendant Joseph also states that he consulted Anderson as to what law materials belonged to the state, but Joseph states that Michael Anderson did not order or authorize him or the other officers to destroy Hendrix's property. (ECF No. 72-24 at 4.) Because Hendrix does not dispute that Anderson, the law librarian, does not have the authority to order correctional sergeants or officers to confiscate an inmate's materials, this claim is granted in favor of Michael Anderson.

Similarly, Defendants Joseph, Nelson and Scott contend that they were not ordered by Anderson to confiscate Hendrix's legal materials and that, if the Court finds that the confiscation of Hendrix's materials still amounts to an adverse action, there was

a legitimate penological goal for confiscation of Hendrix's property. (ECF No. 72 at 11.) Thus, because Hendrix was being transported to a segregation unit where there are more restrictive property limits than in general population units, the confiscation was based on prison policy limiting the number of materials allowed in disciplinary segregation. (*Id.*) Although the Court must view the evidence in the light most favorable to Plaintiff, Plaintiff has failed to rebut Defendants' assertion that the basis of confiscation was a legitimate penological goal. Therefore, summary judgment is granted in favor of Defendants Joseph, Nelson and Scott as to the retaliation claim against them in Count I.

Defendant Filson contends that he did not allow Hendrix to proceed with his classification hearing because Hendrix's behavior threatened safety and security—a legitimate penological interest—and that Hendrix's removal is consistent with NDOC regulations. (ECF No. 72 at 10.) Because Hendrix failed to respond to the motion for summary judgment, he has failed to rebut the justification for his removal from the hearing. Moreover, Filson's denial of Hendrix's grievances related to this incident is consistent with the removal being on the basis of a legitimate penological interest. Therefore, summary judgment is granted in favor of Filson as to the claims against him in Count I.

In light of the Court's finding that the removal of Hendrix was based on a legitimate penological interest, summary judgment is also granted in favor of Defendants Gibson, Leavitt, Kuloloia, Williams, Neven, and Daniels as to the claim against them in Count I.

The First Amendment retaliation claim in Count I is therefore granted in favor of Defendants Michael Anderson, Joseph, Nelson, Scott, Filson, Gibson, Leavitt, Kuloloia, Williams, Neven, and Daniels.

### ii.    Eighth Amendment Excessive Force Claim

Hendrix alleges that Defendants Dawson, Nelson, Paul Anderson, Trailer, Jones,[4] Scott, Stroud, Neven, Filson, Williams, and Dreesen used excessive force when escorting

///

[4]Jones did not join the Motion; therefore, this claim is addressed only as to the other listed defendants.

him to disciplinary segregation on November 15, 2013. (ECF No. 9 at 14-18; No. 9-1 at 3-11.)

An Eighth Amendment claim for excessive force turns on whether force was applied in a good-faith effort to maintain or restore discipline, or whether it was applied maliciously and sadistically for the purpose of causing harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). In determining whether the use of force was wanton and unnecessary, the court may consider the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 7. While an inmate need not have suffered a serious injury in order to bring an excessive force claim against a prison official, the Eight Amendment's prohibition on cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force. *Id.* at 9-10.

Hendrix alleges that Dawson grabbed his head and forced it downwards, ordering him to continue walking whilst handcuffed and shackled. (ECF No. 9-1 at 4.) Dawson then purportedly began punching Hendrix in the face, "ran and jumped" on Hendrix's chest with his knee, and finally turned Hendrix onto his stomach while pressing his knee into Hendrix's back. (*Id.* at 5.) By contrast, Dawson avers that as he escorted Hendrix to a new housing unit, Hendrix ceased walking and pulled his head and upper body back in an aggressive motion towards Dawson, which appeared to be an attempt to head butt him. (*See* ECF No. 72-9 at 2.) Dawson responded with force, securing Hendrix to the ground in order to "restore [his] discipline and to maintain safety and security." (ECF No. 72 at 14.) Defendants also point to medical records showing a lack of "wounds, abrasions, or problems that would be present after the type of excessive force alleged by Hendrix." (*Id.*) However, the Court finds that the exact degree of force used by Dawson is indiscernible from the evidence submitted, as in the Report on the Use of Force Defendant Nelson states that Dawson used an "under hook take down" but in Defendant Nelson's declaration he states that Dawson "quickly restrained" Hendrix by grabbing Hendrix's

shoulder and placing him on the ground. (ECF No. 72-9 at 2; ECF No. 72-17 at 4.) Meanwhile, in Dawson's declaration, he states that he "slid [his] hand up [Hendrix's] back onto [Hendrix's] shoulder, and secured [Hendrix] to the ground." (ECF No. 72-18 at 4.) Even if Hendrix had attempted to strike Dawson using his head in the manner of a head butt, it is unclear what degree of force was actually used in response or whether any force preceded the restraint, as Hendrix alleges in his verified complaint that Dawson unnecessarily punched him in the face prior to being restrained on the ground. (*See* ECF No. 9 at 14-15.) Therefore, the Court denies summary judgment as to Dawson on the excessive force claim against him in Count I.

Similarly, Hendrix contends that during the same incident, Defendant Nelson grabbed him by the handcuffs, bent his left arm up in the air, and then kneed him in the face. (ECF No. 9 at 15.) While Nelson states that he merely secured Hendrix's upper left torso after Dawson responded to Hendrix's attempted head butt, there is a genuine factual dispute as to whether Nelson used more than *de minimis* force because it is unclear if this incident occurred prior to initiation of the submitted video recording (ECF No. 76). Therefore, the Court denies summary judgment as to the excessive force claim against Nelson in Count I.

Hendrix alleges that Paul Anderson kneed him twice in his ribs after Dawson and Nelson had secured him on the ground. (ECF No. 9-1 at 6.) In his declaration, however, Paul Anderson[5] states that he has never worked at HDSP. (ECF No. 72-27 at 3.) Because Plaintiff fails to indicate otherwise, the Court finds there is no genuine dispute as to whether Paul Anderson kicked Hendrix. Therefore, summary judgment is granted in favor of Paul Anderson as to the excessive force claim against him in Count I.

Hendrix alleges that while he was on the ground following the use of force by Nelson and Dawson, Defendant Trailer placed his foot on Hendrix's face and that Trailer subsequently applied Hendrix's leg shackles too tightly and dragged Hendrix into his cell.

_____
[5]Hendrix calls this correctional officer merely "Anderson" in the complaint. (ECF No. 9 at 15.)

(ECF No. 9-1 at 6, 8, 10.) Trailer avers in his declaration that these events did not transpire. (ECF No. 72-28 at 3.) While Defendants have also filed a video recording following the use of force incident, the video begins with Hendrix face down on the ground and several officers restraining him, making it unclear to the Court how long Hendrix was restrained on the ground before the recording began. (*See* ECF No. 76.) Therefore, there are triable issues of fact as to whether Trailer used unnecessary and excessive force prior to the initiation of recording. The Court therefore denies summary judgment as to the excessive force claim against Trailer in Count I.

Hendrix alleges that when a HDSP nurse evaluated his injuries following the use of force incident, Defendant Scott pushed her off[6] and instructed Defendant Dawson to tightly handcuff Hendrix's writing hand. (ECF No. 9-1 at 7-8.) Defendants argue that because Scott made no physical contact with Hendrix, he did not use excessive force against him. (*See* ECF No. 72 at 15-16.) However, Defendant Scott was a correctional sergeant while Dawson was a senior correctional officer, ostensibly making Scott Dawson's supervisor. (*See* ECF No. 72-18 at 3; *see also* ECF No. 72-25 at 3.) Therefore, there are triable issues of fact as to whether Scott directed Dawson to engage in excessive force. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that "[a] supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them"). However, the Court agrees with Defendants that if Scott had pushed the nurse, this does not demonstrate an "unnecessary and wanton infliction of pain" on Hendrix. (ECF No. 72 at 16 (quoting *Whitley v. Albers*, 475 U.S. at 320).) The Court therefore denies summary judgment as to the excessive force claim against Defendant Scott in Count I.

Hendrix alleges that Defendant Stroud, an associate warden at HDSP, ignored his pleas for help while watching correctional officers drag Hendrix into his cell. (ECF No. 9

///

---

[6]It is unclear whether this is meant figuratively or literally.

1  at 17; ECF No. 9-1 at 9; ECF No. 72-29 at 3.) Defendants contend that because Stroud

2  did not personally participate in the alleged excessive force, he cannot be liable for it.

3  (ECF No. 72 at 16.) The Court agrees. Here, there are also no allegations that Stroud

4  authorized or directed the purported use of excessive force by officers against Hendrix.

5  Therefore, summary judgment is granted in favor of Defendant Stroud as to the excessive

6  force claim against him in Count I.

7  Hendrix alleges that Defendants Neven, Filson, Williams, and Dreesen condoned

8  the excessive force against Hendrix through the grievance process. (ECF No. 9-1 at 10.)

9  Defendants argue that neither supervisory liability nor grievance responses give rise to

10  liability under section 1983. (ECF No. 72 at 16.) The Court agrees. Hendrix does not claim

11  that these Defendants authorized or directed the use of force, and their knowledge

12  through the grievance process after the fact would not have enabled them to prevent the

13  alleged use of force from occurring.

14  Hendrix also alleges that Neven failed to properly train Defendants, which resulted

15  in the excessive force incident. Defendants argue that because Hendrix fails to allege any

16  actual personal participation by Neven and there are no allegations Neven knew of the

17  alleged force by other Defendants, summary judgment should be granted in his favor.

18  (ECF No. 72 at 16-17.). The Court agrees.

19  Therefore, the Court grants summary judgment as to the excessive force claim

20  against Defendants Neven, Filson, Williams and Dreesen.

21  **iii.    Eighth Amendment Deliberate Indifference Claim**

22  Hendrix alleges that Adams, Murphy, and Aranas were deliberately indifferent to

23  Hendrix's serious medical needs by denying his grievances requesting medical attention

24  related to the excessive force incident on November 15, 2013. (ECF No. 9-1 at 11.)

25  The Eighth Amendment prohibits the imposition of cruel and unusual punishment

26  and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and

27  decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation marks and

28  citation omitted). "To establish an Eighth Amendment violation, a plaintiff must satisfy

13

both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted). To satisfy the second prong, a plaintiff must show "a purposeful act or failure to respond to a prisoner's pain or possible medial need and [ ] harm caused by the indifference." *Id.* "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (internal quotation marks omitted).

Defendants contend that they were not deliberately indifferent to Hendrix's medical needs because he was evaluated at least six different times by medical staff at both HDSP and ESP in the two and a half months following the incident. (ECF No. 72 at 19.) Defendants claim that a nurse, Manjeshwar, arrived on the scene and evaluated Hendrix, concluding that there were no objective signs of injury. (*Id.*) Defendants further contend that Hendrix did not have a serious medical need because he walked out of a medical appointment following the use of force incident while still at HDSP, upon arrival at ESP it was noted that he did not have any medical issues, and he refused a call with medical staff at ESP soon after arrival. (ECF No. 72 at 20.) However, given the time period after the use of force incident occurred (November 15) and the date that Hendrix was transferred to ESP (December 4), the only documentation about his medical conditions regarding the November 15 incident while he was still at HDSP was that same day, and the fact that Hendrix was sending medical kites regarding lingering pain from the use of force incident in February of 2014 at ESP (ECF No. 75-3 at 17), the Court finds that there is a genuine dispute of material fact as to whether Defendants Adams, Murphy, and Aranas denied his medical kites requesting further medical care. Based on such evidence, there remains a genuine dispute of material fact as to whether the denial of

1  grievances exacerbated the purported injuries sustained by Hendrix during the use of

2  force incident, *see Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th

3  Cir. 1985).

4      The Court therefore denies summary judgment as to the deliberate indifference

5  claim against Adams, Murphy, and Aranas.

6              **iv.    Due Process Claim**

7      Hendrix alleges that on November 15, 2013, Defendants Joseph and Scott

8  confiscated and destroyed Hendrix's legal materials at the direction of Defendants

9  Anderson and Dunn. (ECF No. 9-1 at 1-3.)

10     While an authorized, intentional deprivation of property is actionable under the Due

11 Process Clause, neither a negligent nor intentional unauthorized deprivation of property

12 by a prison official is actionable if a meaningful, post-deprivation remedy is available for

13 the loss. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). An authorized deprivation is one

14 carried out pursuant to established state procedures, regulations, or statutes. *See Piatt*

15 *v. MacDougall*, 773 F.2d 1032, 1036 (9th Cir. 1985). However, "when a prison regulation

16 impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related

17 to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

18     Defendants contend that they confiscated Hendrix's property pursuant to OP

19 711.02(3) and that this policy furthers a legitimate penological goal of recovering and

20 retaining State Property. (ECF No. 72 at 21.) According to Defendants, the legitimate

21 penological goal of this policy is "recovering and retaining State property," which resulted

22 in the permissible taking of property that did not belong to Hendrix. (*Id.*) Because Plaintiff

23 has failed to rebut Defendants' assertion that the basis of confiscation was a legitimate

24 penological goal, the Court grants summary judgment on this claim as to Defendants

25 Michael Anderson, Dunn, Joseph, and Scott.

26 ///

27 ///

28 ///

## C.     Count II

In Count II, Hendrix brings claims for excessive force against Emling, Daniels, Nash, Neven, and Williams, and claims for procedural due process against Emling, Daniels, Nash, Neven and Williams.

### i.     Claims against Emling

Hendrix alleges that Emling choked him to the point of slipping in and out of consciousness when Hendrix was in Emling's office for a preliminary disciplinary hearing. (ECF No. 9-1 at 14.) Hendrix also alleges that during this preliminary hearing Emling spoke to Hendrix's witness on the phone but refused to let Hendrix listen to this testimony. (*Id.* at 13.)

In their Motion, Defendants contend that summary judgment should be granted in their favor with respect to his excessive force claim against Emling because Hendrix failed to exhaust his administrative remedies. (ECF No. 72 at 17.) The failure to exhaust administrative remedies is "an affirmative defense the defendant must plead and prove." *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (internal quotation marks and citation omitted). However, the Court is required to review the evidence in the light most favorable to Plaintiff. *See id.* Because Hendrix claims he exhausted his administrative grievances (*see* ECF No. 9-1 at 19) and because Defendants do not cite to any evidence indicating otherwise, the Court assumes that the excessive force claim against Emling has been exhausted. Defendants also argue that because the grievance filed by Hendrix does not make mention of any choking (ECF No. 72-13), there is not a genuine issue of material fact and Emling is entitled to summary judgment. (ECF No. 72 at 18.) The Court disagrees as it is required to view the evidence in the light most favorable to Hendrix. Because Hendrix alleges in his verified complaint that he was choked and Emling denies doing so (ECF No. 72-30 at 4), there are triable issues of fact for a jury to decide as to whether Emling choked Hendrix. The Court therefore denies summary judgment as to the excessive force claim against Emling in Count II.

///

1    Defendants also contend that because Administrative Regulation 707 affords

2    Hendrix a right to request witnesses during disciplinary hearings but not during

3    preliminary hearings, Hendrix's procedural due process rights were not violated. (ECF

4    No. 72 at 22.) The Court agrees. It is not clear that Hendrix had a protected liberty interest

5    in calling a witness in his preliminary hearing. To the extent that Hendrix did have a

6    protected liberty interest in calling a witness at the preliminary hearing, this interest was

7    met. A prisoner is not entitled to cross-examine or confront witnesses in prison disciplinary

8    hearings. *See Wolff v. McDonnell*, 418 U.S. 539, 567-68 (1974). As a logical

9    consequence of this principle, it is not clearly evident that when presenting a witness in

10   one's defense the prisoner must hear the witness's testimony.

11   The Court therefore grants summary judgment on the procedural due process

12   claim in Count II in favor of Emling.

13                    **ii.    Claims against Daniels, Nash, Neven and Williams**

14   Hendrix alleges that Daniels, Nash, Neven and Williams denied Plaintiff's

15   grievances related to Emling's excessive force and due process violations. (ECF No. 9-1

16   at 14.) Because the Court granted summary judgment in favor of Emling on the procedural

17   due process claim, it also grants summary judgment in favor of Daniels, Nash, Neven and

18   Williams as to this claim.

19   The Court construes the remaining claim against these defendants as an Eighth

20   Amendment supervisory liability claim. As stated previously, a supervisor who is informed

21   of an alleged constitutional violation, such as when reviewing an inmate's administrative

22   grievance, may be liable if they failed to remedy the constitutional violation. *See Jett*, 439

23   F.3d at 1096; *see also* discussion *supra* §§ IV(b)(ii) and (iii). However, assuming these

24   defendants were on notice of the purported choking incident, they would not have been

25   able to remedy the violation, as there are no allegations or evidence of permanent, serious

26   medical issues as a result of this incident.

27   Therefore, the Court grants summary judgment in favor of Daniels, Nash, Neven

28   and Williams as to the claims in Count II.

**D.    Count III**

In Count III, Hendrix brings claims for retaliation and procedural due process against Potter, Neven, Foster, Daniels, and Filson. (ECF No. 9 at 18-19; ECF No. 9-1 at 15-17.)

**i.    Claims against Potter**

Hendrix alleges that Potter refused to let Hendrix call a witness at his disciplinary hearing because Hendrix had testified before the inspector general and had caused a fellow correctional officer to be suspended. (ECF No. 9 at 19-20; ECF No 9-1 at 15-16; ECF No. 8 at 13-14.)

In support of summary judgment, Defendants introduced a form detailing the disciplinary hearing, which was filled out by Potter. (ECF No. 72 at 23; ECF No. 72-2 at 6-9.) In this form, Potter states that Hendrix elected not to call any witnesses. (ECF No. 72-2 at 7.) Additionally, in the audio recording of the disciplinary hearing, Potter asked Hendrix if he wished to call any witnesses, to which Hendrix responded "no." (ECF No. 72-3.) However, in his verified complaint, Hendrix states that prior to the hearing, Potter informed Hendrix that he had already found Hendrix guilty and that "Potter told [him] that there will be no kind of witness." (ECF No. 9-1 at 15.) Defendant does not dispute that he made this statement to Hendrix. (*See* ECF No. 72 at 23.) Therefore, it is unclear to the Court whether Hendrix's response of "no" when asked if he wanted to call a witness was genuine. As a matter of law, procedural due process is not met when the decision maker is neither neutral nor detached. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617 (1993). Given Hendrix's allegations concerning Potter's statements that no witnesses would be called and that Potter had already found Hendrix guilty (ECF No. 9-1 at 15), there are triable issues of fact as to whether Potter was neutral. Moreover, procedural due process requires that a party be given an opportunity to be heard at a meaningful time and in a meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Given Potter's alleged statements prior to the

///

18

1  hearing, there are triable issues of fact as to whether Hendrix was afforded a meaningful

2  opportunity to be heard.

3  As to Hendrix's claim that Potter's refusal to permit Hendrix to call a witness was

4  an act of retaliation, the Court also finds that there is a genuine issue of material fact as

5  to whether Potter actually told Hendrix he had already found him guilty.

6  Therefore, the Court denies summary judgment as to the claims against Potter on

7  Count III.

8  **ii.    Claims against Neven, Foster, Daniels, and Filson**

9  In Count III, Hendrix alleges that Neven, Foster, Daniels, and Filson denied his

10  grievances. (ECF No. 9-1 at 17; ECF No. 8 at 13.) As Defendants note in their Motion,

11  there are no allegations that these officers were present at the disciplinary hearing. (ECF

12  No. 72 at 24.)

13  The Court construes these claims as First and Fourteenth Amendment supervisory

14  liability claims against these defendants. Neven, Foster and Filson are supervisors.[7]

15  Because Hendrix does not claim that these Defendants authorized or directed the

16  purported due process violation, and their knowledge through the grievance process after

17  the fact would not have enabled them to prevent the alleged violation from occurring, the

18  Court grants summary judgment in favor of Defendants Neven, Foster, Daniels, and

19  Filson as to the retaliation and procedural due process claims against them in Count III.

20  **E.    Qualified Immunity**

21  Defendants also argue in the alternative that they are entitled to qualified immunity

22  "to the extent the liability alleged by Hendrix consists of responding to his grievances and

23  claims of supervisory liability." (ECF No. 72 at 25.) They also argue that no reasonable

24  prison official would have thought that adhering to the legitimate penological goals of

25  restoring Hendrix's discipline and maintaining the safety and security of the prison and its

26  inmates constituted a violation of Hendrix's constitutional rights. (*Id.*) Finally, Defendants

27

28  [7]Because Defendant Daniels is a correctional caseworker (ECF No. 9 at 2), and not a supervisor, summary judgment is granted in his favor.

19

contend that because Hendrix was consistently evaluated by medical staff who reasonably responded to Hendrix's medical complaints, Defendants are entitled to qualified immunity for any claims of deliberate indifference to Hendrix's medical needs. (*Id.*)

Because Defendants failed to identify why qualified immunity should apply to the specific claims that the Court has permitted to proceed, the Court declines to address the argument as to qualified immunity but permits Defendants leave to file a renewed motion for summary judgment regarding qualified immunity as to the claims that proceed.

## V.      CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Defendants' motions.

It is therefore ordered that Defendants' Motion for Summary Judgment (ECF No. 72) is granted in part and denied in part.

The Court permits the following claims to proceed: the retaliation claim against Dunn in Count I; the excessive force claims against Dawson, Nelson, Scott, Trailer, and Jones in Count I; the deliberate indifference claim against Maryeswar, Adams, Murphy, and Aranas in Count I; the excessive force claim against Emling in Count II; the procedural due process and retaliation claims against Potter in Count III.

The Court also permits Defendants to file a renewed motion for summary judgment on the basis of qualified immunity. Defendants have twenty-one (21) days from entry of this Order to file their renewed motion.

It is further ordered that Defendants' Motion to Seal (ECF No. 74) is granted.

DATED THIS 27th day of September 2017

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE